**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

JOHN WOODSIDE, III

        Plaintiff,

    v.

PACIFIC UNION FINANCIAL, LLC

        Defendant.

Civil Action No. _____

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff John Leonard Woodside, III brings this action, on behalf of himself and all others similarly situated, against Pacific Union Financial, LLC ("Pacific Union"). Based upon information and belief, the investigation of undersigned counsel, and personal knowledge of the facts pertaining to himself, Plaintiff Woodside alleges as follows:

**NATURE OF THE CASE**

1.    This is a class action for breach of contract and breach of fiduciary duty brought against one of the nation's largest mortgage companies.

2.    Pacific Union holds and services thousands of mortgages throughout the United States.  Pacific Union's borrowers, including Plaintiff Woodside and the class he seeks to represent, must keep certain insurance coverage to protect the property, including flood and other hazard insurance.

3.    For a variety of reasons, including simple error and lack of communication, sometimes borrowers' insurance coverage lapses.  In those circumstances, Pacific Union has a right to obtain reasonable insurance covering the property and to charge the borrower for the

premiums.  But Pacific Union also has the very important responsibility to ensure that such premiums are reasonable in light of available market rates and circumstances affecting the property.

4.      Pacific Union has failed in its responsibility.  After entering into exclusive agreements with an offshore insurer, Pacific Union has placed insurance on its borrowers' properties at rates up to 8 times market rates.  The forced-place insurance rates imposed by Pacific Union are unreasonable on their face. Plaintiff and the Class bring this action to put a stop to Pacific Union's unlawful and injurious practices.

5.      Based on the actions of Pacific Union which are common to all Class members, Plaintiff seeks certification of a class action as set forth below, and recovery of all damages and relief, equitable and legal, as well as attorney's fees and costs, as permitted by applicable law.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because there are more than 100 class members, the aggregate amount in controversy exceeds $5,000,000, and minimal diversity exists.

7.      This Court has personal jurisdiction over this action because Pacific Union intentionally avails itself of this jurisdiction by marketing and selling products, including mortgage products and force-placed insurance, to residents of Louisiana.

8.      Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred and/or emanated from this District, and Defendant has caused harm to class members residing in this District.

## PARTIES

9.      Plaintiff John Woodside, III is a resident and citizen of Madisonville, Louisiana.

10.     Defendant Pacific Union Financial, LLC is a California limited liability corporation with its principal place of business at 8900 Freeport Parkway, Suite 150, Irving, Texas 75063. The members of Pacific Union are individual residents and citizens of Texas.

## FACTUAL ALLEGATIONS

### A.  Overview of Force-Placed Insurance

11.     Standard mortgage contracts contain a requirement that a borrower maintain insurance to protect the property serving as collateral for the mortgage loan in amounts and coverage specified by the lender or servicer. The contracts also contain a provision that the lender or servicer may obtain insurance at the borrower's expense if the borrower fails to maintain required insurance coverage. Depending on the location of the property, the required coverages could include hazard, flood, and/or wind-only.

12.     Ordinarily, borrowers are responsible for and obtain insurance to meet coverage requirements.  In circumstances where a borrower's coverage has lapsed, the servicer has the right to obtain insurance and place it on the borrower's property.  When that happens, the insurance is called FPI or Lender-Placed Insurance ("LPI"). "LPI, also known as "force-placed" or "creditor-placed" insurance, is an insurance policy purchased by a mortgage servicer on a home to ensure continuous coverage when the borrower's homeowners or flood insurance lapses or otherwise becomes inadequate." U.S. Gen. Acct. Office, *GAO-15-631, LENDER-PLACED INSURANCE: More Robust Data Could Improve Oversight*, at 4 (September 2015) ("GAO Study"), attached as Exhibit A.

13.     Borrowers have no say in the selection of the FPI carrier or the terms of the FPI policies, nor do borrowers have any opportunity to comparison-shop for FPI policies. The terms and conditions of the insurance policy, as well as the cost of the policy, are determined by the

servicer and the insurer, rather than negotiated between the borrower and the insurer. *See* Testimony of J. Robert Hunter, of the Consumer Federation of America dated May 17, 2012, at 10 ("Hunter NYDFS Testimony"), attached as Exhibit B.

14.　　Servicers generally contract with FPI providers to cover all the mortgages in their portfolios from the date any borrower-purchased coverage lapses, regardless of when the coverage lapse is discovered. Exhibit A, GAO Study, at 5. In obtaining a blanket policy for all properties they service, insurers do not underwrite properties individually and do not assess the condition of individual properties when providing coverage, as they would if providing an individual policy to the borrower. *Id.* at 7.

15.　　Because their blanket policy is funded entirely by charges assessed to the borrower whose insurance policy is force-placed, the servicer actually has an incentive to purchase the *highest* priced insurance, an interest diametrically opposed to that of the borrower. *See, e.g.*, Exhibit B, Hunter NYDFS Testimony, at 1.

16.　　The divergence of the economic interests of borrowers and their mortgage servicers provides tremendous incentives for abuse in the administration of force-placed insurance. As noted by Birny Birnbaum, the Executive Director of the Center for Economic Justice, in his July 28, 2011 testimony before the U.S. House of Representatives Subcommittee on Insurance, Housing and Community Opportunity Committee on Financial Services (attached as Exhibit C):

> Consumers do not request the insurance, but are forced to pay for it. The cost of [FPI] is much higher than a policy the borrower would purchase on his or her own. Lenders have incentive to force-place the insurance because the premium includes a commission to the lender and, in some cases, the insurance is reinsured through a captive reinsurer of the lender, resulting in additional revenue to the lender from the force-placement of the coverage.

17.　　Mortgage servicers are also financially motivated to utilize the insurer that offers

the best financial benefit *to the servicer* in terms of the below-cost portfolio monitoring and tracking, expense reimbursement, and other things of value that are established as part of the agreements among the servicers, insurers, and their affiliates.

18.    For example, servicers often include within the amounts charged to borrowers expenses associated with servicing *all* the loans they service; consequently, the small percentage of borrowers who pay for FPI shoulder the costs of monitoring the servicer's entire loan portfolio – resulting in, effectively, the enrichment of the servicer at the borrower's expense. *See* Testimony of Birny Birnbaum on Behalf of the Center for Economic Justice for the Florida Office of Insurance Regulation (July 3, 2012), attached as Exhibit D ("Birnbaum Florida Testimony"); Exhibit A, GAO Study, at 7.

19.    The divergent interests of borrowers and their mortgage servicers have led to several abusive and illegal practices related to force-placed insurance, many of which were brought to light by regulators and investigative reporters. As one journalist observed:

> In the pantheon of modern-day mortgage abuses, force-placed insurance hasn't attracted much attention. But it generates hundreds of millions of dollars a year in fees and commissions for insurance companies, banks and other financial institutions. Policies are sometimes backdated to cover periods that have already passed.
>
> In essence, critics say, high-priced insurance policies cover a time when no events happened. And often, the mortgage company and the force-placed-insurance company are affiliated, with the mortgage company receiving a "service fee" in return for the business. But homeowners don't know that.

*See* Dave Lieber, *Everyone Profits Off Force-Placed Insurance, Except Homeowner*, Star-Telegram (Oct. 1, 2011), attached as Exhibit E.

**B. Abusive Servicer Practices in Connection with Force-Placed Insurance.**

20.    The 2007-2009 financial crisis spurred several investigations by state insurance regulators and consumer groups "who raised questions about the high cost of [force-placed]

insurance, citing investigations and studies saying that the amount of claims that [force-placed] insurers pay does not justify the premium rates. These groups also expressed concerns that borrowers had little influence over the price of [force-placed insurance] because the lender selects the insurer. Further, they said that some insurers might compete for the servicers' business by providing commissions to the servicer and passing the costs on to the borrower through higher premium rates." Exhibit A, GAO Study, at 2.

21.     In October 2011, several mortgage servicers and insurers received subpoenas from the New York Department of Financial Services ("NYDFS") with respect to FPI activities dating back to September 2005. The NYDFS conducted hearings on May 17, 18 and 21, 2012, during which the FPI practices of servicers and their affiliates, subsidiaries and bank partners were among the topics addressed by witnesses and  in written testimony.

22.     Superintendent Benjamin N. Lawsky noted in his opening statement that the Department's initial inquiry uncovered "serious concern and red flags" which included: (1) exponentially higher premiums for FPI than regular homeowners insurance; (2) extraordinarily low loss ratios; (3) harm to distressed borrowers; (4) lack of competition in the market; (5) that FPI has become a major profit center for both banks and insurers; and (6) the "tight relationships between banks, their subsidiaries and insurers." As Superintendent Lawsky summarized:

> [W]hen you combine [the] close and intricate web of relationships between banks and insurance companies on the one hand, with high premiums, low loss ratios and lack of competition on the other hand, it raises serious issues and questions…

Opening Statement of Benjamin M. Lawsky, Superintendent of NYDFS, May 17, 2012, attached as Exhibit F.

23.     The NYDFS heard testimony from several servicers and insurers as well as noted experts during its FPI investigation. *See, e.g.*, Testimony of John Frobose, President of ASIC

("ASIC NYDFS Testimony"), submitted to the NYDFS, attached as Exhibit G; Testimony of Birny Birnbaum on behalf of the Center for Economic Justice, May 21, 2012 ("Birnbaum NYDFS Testimony"), attached as Exhibit H; and Exhibit B, the Hunter NYDFS Testimony. Through its investigation, NYDFS found:

> that insurers and banks built a network of troubling relationships and payoffs that helped drive premiums sky high. Those improper practices created significant conflicts of interest and saddled homeowners, taxpayer, and investors with millions of dollars in unfair and unnecessary costs.
>
> Indeed, even though banks and servicers are the one who choose which force-placed insurance policy to purchase, the high premiums are ultimately charged to homeowners…

*See* New York Department of Financial Services Press Release dated March 21, 2013 ("NYDFS March 21, 2013 Press Release"), attached as Exhibit I.

24.     Ultimately, the NYDFS reached settlements with the four largest force-place insurers that required those insurers to (1) refile premium rates with a permissible loss ratio of 62 percent; to refile rates every 3 years; (2) annually refile any rates that have an actual loss ratio of less than 40 percent; (4) have separate rates for force-placed and borrower-purchased insurance; and (5) prohibited certain practices, including the payment of commissions. Exhibit A, GAO Study, at 28. The settlements also required the four insurers to pay restitutions to eligible claimants and pay a combined total of $25 million in civil money penalties to NYDFS. *Id.*

25.     A similar investigation by the National Association of Insurance Commissioners ("NAIC")—the standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the Districts of Columbia and five U.S. territories—also found the abusive practices so troubling that it was compelled to hold public hearings on August 9, 2012. *See* NAIC Promises Greater Focus on Force-Placed Insurance as CFPB Proposes Rules, attached as Exhibit J.

26.     The NAIC, like the NYDFS, uncovered enough troublesome information regarding the force-placed insurance industry and its associated practices to warrant its full attention.

> Concern[s] have also been raised over whether the growing use of lender-placed insurance is "reverse competition," where the lender chooses the coverage provider and amount, yet the consumer is obligated to pay the cost of coverage. Reverse competition is a market condition that tends to drive up prices to the consumers, as the lender is not motivated to select the lowest price for coverage since the cost is born by the borrower. Normally competitive forces tend to drive down costs for consumers. However, in this case, the lender is motivated to select coverage from an insurer looking out for the lender's interest rather than the borrower.

http://www.naic.org/cipr_topics/topic_lender_placed_insurance.htm (last visited June 5, 2017).

27.     Industry insiders acknowledge that force-placed insurance premiums are "a lot more expensive than other alternatives" because the administrative costs "are bundled into the costs of the premium." *See* Testimony of Joseph Markowicz (PRP Claims), Public Hearing on Private Lender-Placed Insurance, Property and Casualty Insurance Committee, Market Regulation and Consumer Affairs Committee, National Ass'n of Insurance Commissioners, August 9, 2012, http://www.naic.org/documents/committees_c_120809_public_hearing_lender_placed_insurance _testimony_markowicz.pdf (last visited June 5, 2017). Mr. Markowicz also confirmed that administrative costs "tend to keep premium costs high" because expenses "which include the administrative work of the letter campaigns and tracking services provided to the loan servicer" are bundled into the premium. *Id.*

**C. Plaintiff and the Class Were the Victims of Abusive Practices by Pacific Union.**

28.     This case centers on Pacific Union's abusive practices directed toward the borrowers it had a fiduciary duty to protect. At all times relevant to this complaint, Pacific

Union force-placed insurance on Plaintiff and the proposed class at rates far exceeding any competitive rate for flood or hazard insurance.  Pacific Union did so after entering into exclusive relationships with an insurer designed to pad extensively Pacific Union's bottom line—not to reasonably protect assets under its servicing control.  As a result, Pacific Union reaped significant financial benefits at the expense of Plaintiff and the Class.

29.    Plaintiff Woodside's individual experience in this case is illustrative of Pacific Union's practices with respect to the proposed Class. On May 6, 2014, John Woodside bought a home and property at 119 Hano Road, Madisonville, LA for $170,000, on which he took a $157,712 loan from American National Mortgage Co., Inc. The loan was immediately sold to (and is now serviced by) Pacific Union Financial, LLC.

30.    The HUD-1 and other closing documents show that at the closing, two months of flood insurance payments were escrowed at $29.92/mo.—or about $360.00/year—since the property is in an area designated by FEMA as being a "Special Flood Hazard Area." The mortgage documents likewise call for an escrow account for the required flood insurance, and requires flood insurance to be maintained "to the extent required by the Secretary" [which is defined as the Secretary of Housing and Urban Development].

31.    The two months of flood insurance coverage obtained at closing were followed by a policy obtained by Mr. Woodside providing $207,000.00 worth of coverage from May 2, 2014 through May 2, 2015, at an annual premium of $788.00. The policy included $40,000 in coverage for personal property and $167,000 coverage for the secured real property.

32.    On May 7, 2015, Pacific Union alleges it sent a letter to Woodside stating that the flood insurance "was cancelled, expired, or was unacceptable as of May 2, 2015" and that it "had not received an acceptable renewal or replacement policy." The letter further stated that

if Pacific Union did not receive replacement or renewal flood insurance within 45 days, they would purchase coverage and it would cost "at least $8,196.62 annually."

33.    On June 23, 2015, Pacific Union notified Woodside that it had acquired force-placed flood insurance for the property in an insured amount of $155,646 at an annual cost of $8,196.62 through "Ironshore Europe Limited," and that the policy would be cancelled if an acceptable policy was provided. On August 14, 2015, Pacific Union paid itself $8,196.62 for the FPI out of Woodside's escrow account.

34.    On March 22, 2016, Pacific Union notified Woodside that the FPI policy had been cancelled effective March 16, 2016 because acceptable coverage had been provided, and provided a $1,055.43 credit to Woodside's escrow account.

35.    Pacific Union describes itself as a mortgagor who puts its customers first. *See http://www.pacificunionfinancial.com/Our-Experience* (last visited June 5, 2017).

36.    However, Pacific Union and Ironshore entered into exclusive contracts that provide FPI policies to Pacific Union, which Pacific Union purchases at excessive cost by diverting the borrowers' monthly mortgage payments and/or debiting the borrowers' escrow accounts.

37.    The forced placement of insurance for the May 2, 2015 to March 16, 2016 period, for which Pacific Union paid itself $7,141.19 (the $8,196.62 charge to escrow, less the later $1,055.43 credit), was excessive and unreasonable. The discretion afforded Pacific Union to force-place insurance is limited by the bounds of reasonable conduct and by the express terms of the mortgage itself.

38.    The prima facie evidence of the excessive and unreasonable nature of the charge is the exorbitant FPI charge imposed by Pacific Union of $8,155 for $155,000 of coverage

provided by the non-rate regulated, surplus lines insurer, Ironshore. In comparison, FPI flood rates filed and approved for an admitted insurer in Florida were either $.90 or $1.55 per hundred of coverage as opposed to the $6.00 per hundred charged by Pacific Union.

39.     The mortgage contract does not disclose that the lender or other servicer will receive a financial benefit in connection with the FPI policy. Instead, the contract limits the authority of the mortgage servicer to force-place insurance sufficient to protect the lender's interest in the secured property only.

40.     In breach of Plaintiff's and Class Members' mortgage agreements, the amount Pacific Union charged for FPI was not to protect the lender's interest in the secured property; instead, Pacific Union included in the amounts charged additional sums unrelated to the legitimate protection of Pacific Union's interest in the property, such as amounts attributable to Pacific Union's routine mortgage servicing functions for which it was already compensated.

41.     Pacific Union's arrangement with Ironshore tends to keep the amounts charged to borrowers for FPI artificially inflated over time because a portion of the charges assessed to borrowers is not actually being paid to cover actual risk, but are simply funding hidden profits to the servicer.

42.     Amounts paid to servicers such as expense reimbursements and below-market rate outsourced services have become a part of the cost of doing business for FPI providers. As a result, the charges assessed to borrowers for FPI incorporate the payment of such costs of doing business for Ironshore—to the detriment of consumers.

43.     Explanations for the high cost of such force-placed insurance servicing are "unsupported by any evidence." See Exhibit H, Birnbaum NYDFS Testimony, at 1. And while servicers often attempt to blame the exorbitant cost of FPI on the fact that the policy is issued

without the benefit of a prior inspection of the property, according to the National Consumer Law Center, as a general matter, insurers do not routinely inspect residential properties in the course of underwriting. *Id.*

44.    FPI policies are not underwritten on an individual policy basis. Rather, servicers' contracts with FPI providers require, or at least permit, the insurer to automatically issue these policies when a borrower's insurance coverage is not maintained. Thus, as J. Robert Hunter in his testimony before the New York Financial Services Department testified, "lack of underwriting should also result in much lower acquisition expenses for FPI insurers, since no sales force is required to place the insurance." See Exhibit B, Hunter NYFSD Testimony, at 5. Yet it does not. Instead, the arrangement between Pacific Union and Ironshore permits the taking advantage of consumers.

45.    Servicers also commonly attempt to justify the high price of FPI policies by pointing to the higher risk associated with the lack of individual policy underwriting, but that too is false. As Birny Birnbaum, in his testimony before the New York Department of Financial Services, noted, statistics collected by the NAIC reflect nationwide loss ratios for LPI (or FPI) hazard insurance during the 2004-2011 period as being, on average, more than 35 percentage points <u>lower</u> than the ratios for commercially available homeowners policies. *See* Exhibit H, Birnbaum NYDFS Testimony, at 9. When confined to the period from 2007-2011, the disparity between force-placed hazard insurance loss ratios and those of commercially available homeowners policies was nearly 43 percentage points. *Id.* Moreover, because the policies are not individually underwritten, the force-placed insurer is spared the costs associated with individual underwriting, which should actually decrease the cost of insurance. *See* Exhibit H, Birnbaum NYDFS Testimony, at 26.

46.     Industry analysts have also opined that referral fees, commissions and other payments to bank affiliates explain why insurers' overhead, which is ultimately passed on to borrowers, is higher, implying paydays for servicers amounting to hundreds of millions of dollars per year. The charges that Pacific Union chose to impose upon borrowers for FPI also unlawfully included the cost of portfolio monitoring and tracking services for Pacific Union's entire loan portfolio, the cost of which was then passed onto the small percentage of borrowers whose properties were force-placed.

### CLASS ACTION ALLEGATIONS

47.     Plaintiff brings this action on behalf of the following Class for the maximum time period allowed by law:

> a nationwide Class consisting of all persons who, within the applicable statute of limitations, were charged for force-placed insurance by Pacific Union. This excludes Pacific Union, Ironshore and any entity in which Pacific Union or Ironshore has a controlling interest, and their officers, directors, legal representatives, successors and assigns, and excluding all government entities and judicial officers that have any role in adjudicating this matter.

48.     The Class is so numerous that joinder of all members is impracticable.

49.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

50.     Plaintiffs' claims are typical of the claims of the Class.

51.     There are questions of law and fact common to the Class, the answers to which will advance the resolution of the claims of all Class members and that include, without limitation:

> a.  The nature, scope and implementation of Pacific Union's unlawful, improper and fraudulent acts;

> b.  Whether Pacific Union maintained a policy of referring force-placed insurance business to insurers pursuant to pre-arranged agreements;

c.  Whether Pacific Union received below-cost portfolio monitoring and tracking services or any other payments or things of value from its force-placed insurance provider Ironshore and/or its affiliates;

d.  Whether Pacific Union participated in arrangements that involved kickbacks;

e.  Whether Pacific Union received expense reimbursements from Ironshore and/or its affiliates and misrepresented those reimbursements to borrowers;

f.  Whether Pacific Union received financial benefits from the force-placed insurance providers in the form of insurance monitoring, tracking and processing services;

g.  Whether Pacific Union disguised amounts charged to borrowers in order to permit Pacific Union to collect amounts from force-placed borrowers in excess of what Pacific Union was entitled to collect from those borrowers;

h.  Whether Pacific Union's conduct constituted an unconscionable business practice;

i.  Whether Pacific Union breached the implied covenant of good faith and fair dealing in Plaintiffs' and members of the Classes' mortgages or loan contracts;

j.  Whether Pacific Union breached the terms of Plaintiffs' and members of the Classes' mortgages or loan contracts;

k.  Whether Pacific Union's business practices alleged herein are deceptive acts or practices;

l.  Whether Pacific Union breached its fiduciary duty to Plaintiffs and members of the Classes;

m.  Whether Pacific Union conspired with Ironshore in furtherance of the unlawful acts alleged herein;

n.  Whether the scheme described between Pacific Union and Ironshore resulted in injury to Plaintiff and Class members;

o.  Whether Pacific Union and Ironshore misrepresented the amounts charged to borrowers as force-placed insurance;

p.  Whether Pacific Union is liable to Plaintiffs and the Classes for damages, and if so, the measure of such damages; and

q.  Whether Plaintiffs and the Classes are entitled to declaratory, injunctive, restitutionary and other equitable relief.

52.   These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual members of the Class.

53.   The same common issues predominate with respect to all Class members, regardless of whether their loans were originated by or merely serviced by Pacific Union.

54.   Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has no claims antagonistic to those of the Class. Plaintiff has retained counsel competent and experienced in complex nationwide class actions, including all aspects of this litigation. Plaintiff's counsel will fairly, adequately and vigorously protect the interests of the Class.

55.   Class action status is warranted because the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Pacific Union.

56.   Class action status is also warranted because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

57.   Class action status is also warranted because Pacific Union has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief, and disgorgement of illicit profits with respect to the Class common.

58.   Class action status is also warranted because questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members,

and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### COUNT ONE
### BREACH OF CONTRACT, INCLUDING BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

59.     Plaintiff hereby incorporates by reference paragraphs 1 through 58 as if they were fully set forth herein.

60.     Pacific Union has originated and/or serviced loans evidenced by substantially similar standard form notes, form mortgage contracts, and form deeds of trust.

61.     To the extent that the mortgage contracts of Plaintiffs and the Classes permitted Pacific Union to unilaterally force-place insurance, Pacific Union was contractually permitted to do so only in a reasonable manner, *i.e.*, only to the extent reasonably necessary to protect the mortgagee's interest in the secured property.

62.     Nonetheless, Pacific Union imposed or collected amounts that exceeded the amounts reasonable, necessary, or appropriate to protect the mortgagee's interest in the property. Such practices have included, without limitation: (a) requiring borrowers to pay for insurance coverage that exceeds the amount necessary to protect the mortgagee's interest in the secured property; (b) backdating FPI policies, thus requiring borrowers to pay for retroactive coverage despite the fact that time has lapsed and no loss occurred during the lapsed period; and (c) requiring borrowers to pay for FPI policies despite the existence of a Lender's Loss Payable Endorsement or standard mortgage clause that already protects the lender's interest in the property.

63.     While the mortgage documents afforded the Pacific Union the discretion to force-

place insurance on Plaintiff's property, Pacific Union failed to act in a "reasonable" or "appropriate" manner.

64.    Amounts charged to Plaintiff and Class Members that included illicit expense reimbursements and outsourcing costs were attributable to Pacific Union's routine loan servicing functions – they were not the cost of insurance.

65.    By force-placing insurance in the manner described herein, Pacific Union has breached its explicit contractual obligations owed to Plaintiff and the Class.

66.    As a direct, proximate, and legal result of the afore-mentioned breaches of the mortgage contracts, Plaintiff and the Class have suffered damages and are entitled to the relief sought herein.

67.    In addition, the mortgage contracts of Plaintiff and the Class each contained an implied covenant of good faith and fair dealing, pursuant to which Pacific Union was bound to exercise the discretion afforded it under the mortgage contract in good faith and to deal fairly with Plaintiff and the Class in that regard.

68.    To the extent that the mortgage contracts of Plaintiff and the Class permitted Pacific Union to unilaterally force-place insurance, Pacific Union was obligated not to exercise its discretion by acting in bad faith (for its own financial gain for the purposes of maximizing profits at borrowers' expense).

69.    Pacific Union breached its duties of good faith and fair dealing in at least the following respects, among others:

a.    Failing to make any effort to maintain borrowers' existing insurance policies and, instead – for the sole purpose of maximizing its own profit – forcing borrowers to pay for insurance policies from providers of Pacific Union's choice. These policies needlessly came with substantially greater premiums, while providing less coverage than borrowers' existing policies;

b.    Abusing its discretion to choose a force-placed insurance provider and acting

in bad faith and in contravention of the parties' reasonable expectations, by purposefully forcing borrowers to pay for both; (i) the actual costs of protecting the mortgagee's interest in the property; and (ii) the cost of the payments and other things of value Pacific Union accepted from the force-placed insurance provider;

c.  Failing to seek competitive bids on the open market or otherwise making good faith efforts to reasonably exercise its discretion and instead selecting force-placed insurance providers according to pre-arranged deals whereby the insurance policies are continually purchased at excessive costs through the same companies in order to produce additional profits for Pacific Union;

d.  Assessing excessive, unreasonable, and unnecessary charges against Plaintiff and the Class and misrepresenting the reason for the cost of the policies;

e.  Backdating force-placed insurance policies to cover time periods which already passed and for which there was no risk of loss;

f.  Misrepresenting in its force-placed insurance notices that borrowers were obligated to pay for backdated insurance coverage for periods during which the lender had no risk of loss due to the passing of time or the lender's coverage under a Lender's Loss Payable Endorsement or "standard mortgage clause;"

g.  Procuring FPI policies to cover time periods during which the mortgagee is already covered pursuant to a Lender's Loss Payable Endorsement or "standard mortgage clause;" and

h.  Failing to provide borrowers with any meaningful opportunity to opt out of having their FPI policies provided by an insurer with whom Pacific Union has an agreement to pay monies or provide other things of value to Pacific Union in return for being a provider of FPI for Pacific Union's portfolio of loan.

70.  As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiff and the members of the Class have suffered damages in an amount to be proven at trial.

## COUNT TWO
## BREACH OF FIDUCIARY DUTY/
## MISAPPROPRIATION OF FUNDS HELD IN TRUST

71.  Plaintiff hereby incorporates by reference paragraphs 1 through 70 as if they were fully set forth herein.

72. Pursuant to Plaintiff's mortgage (and the mortgages of the Class), Pacific Union is entitled to hold and/or control funds in escrow and control the establishment, funding requirements and maintenance of escrow accounts for the purpose of paying insurance premiums and other items set forth in borrowers' mortgages. Pacific Union is also obligated under the mortgages to return any excess escrow funds in accordance with the terms of the mortgages.

73. To reimburse itself for amounts paid by Pacific Union to Ironshore for FPI, Pacific Union paid itself from Plaintiff's escrow account.

74. Pacific Union was obliged to hold, manage and control any escrow funds in trust, and owes Plaintiff and members of the Class the highest fiduciary duty with respect to the handling of such funds.

75. Pacific Union breached its fiduciary duty to Plaintiff and the members of the Class by *inter alia*: (a) engaging in self-dealing by unilaterally using Plaintiff's and Class Members' escrow accounts to generate additional profits for Pacific Union; (b) profiting from unnecessary and excessive FPI policies that were purchased from escrow funds at the expense of Plaintiff and the members of the Class; (c) unilaterally utilizing the escrow funds to pay for unnecessary and duplicative insurance for purposes of increasing its profits; and (d) improperly depleting the escrow funds (including assessing negative balances) for unnecessary, unauthorized and duplicative insurance resulting in additional costs and injury to Plaintiff and the members of the Class.

76. These actions were undertaken by Pacific Union in bad faith solely for the benefit of Pacific Union and were not intended to benefit Plaintiff or other Class members.

77. As a direct result of Pacific Union's actions and subversion of Plaintiff's interest to Pacific Union's own interests in reaping additional, extravagant and unauthorized fees and

profits, Plaintiff and the members of the Class have suffered injuries in the form of unnecessary and excessive escrow charges, unnecessary and improper depletion of escrow funds intended for and properly allocated to other escrow items, a loss of funds from their escrow accounts and/or loss of equity in the property due to increases in the amounts due under the mortgage to cover escrow shortfalls.

78.    Plaintiff and members of the Class are entitled to all damages resulting from Pacific Union's breach of its fiduciary obligations and misappropriation of escrow funds. In addition, Plaintiff and the Class are entitled to punitive damages because Pacific Union acted in bad faith in deliberate and/or reckless disregard of their rights and the obligation on Pacific Union to hold their escrow funds in trust.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all claims in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter a judgment against Pacific Union and in favor of Plaintiff and the Class and award the following relief:

a.  That this action be certified as a class action declaring Plaintiff as representative of the Class and Plaintiff's counsel as counsel for the Class;

b.  That the conduct alleged herein be declared, adjudged, and decreed to be unlawful;

c.  Compensatory, consequential, and general damages in an amount to be determined at trial;

d.  Restitution and/or disgorgement of Pacific Union's ill-gotten gains, and the imposition of an equitable constructive trust over all such amounts for the benefit of the Class;

e.  A judgment declaring that Pacific Union must cease the activities described herein, and provide members of the Class with adequate remedies, including, without limitation, refunds or credits of all unfair, unlawful or otherwise improper force-placed insurance charges, and provide for adequate policies and procedures to ensure that Pacific Union's unlawful conduct does not continue, including, without limitation, that Pacific Union: (i) is prohibited

from force-placing insurance when the servicer knows or has reason to know that the borrower has a policy in effect that meets the minimum requirement of the loan documents; (ii) is prohibited from force-placing excessive flood insurance; (iii) is prohibited from splitting fees, giving or accepting kickbacks or referral fees, or accepting anything of value in relation to the purchase or placement of force-placed insurance; (iv) must make reasonable efforts to continue or reestablish the borrower's existing insurance policy if there is a lapse in payment; (v) must purchase any force-placed insurance for a commercially reasonable price; and (vi) is prohibited from backdating force-placed insurance policies absent evidence of damage to the property or claims arising out of the property during any lapse periods;

f. Costs and disbursements of the action;

g. Pre- and post-judgment interest;

h. Reasonable attorneys' fees;

i. Punitive damages; and

j. Such other and further relief as this Court may deem just and proper.

DATED: November 10, 2017                Respectfully Submitted,

*/s/ Amanda K. Klevorn*
Korey A. Nelson (LA #30002)
Amanda K. Klevorn (LA #35193)
Lydia A. Wright (LA #37926)
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, Louisiana 70130
T: 504.799.2845
F: 504.881.1765
E: knelson@burnscharest.com
aklevorn@burnscharest.com
lwright@burnscharest.com

Warren T. Burns, (TX #24053119)
to be admitted *Pro Hac Vice*
Larry Vincent, Jr. (TX # 20585590)
to be admitted *Pro Hac Vice*
**BURNS CHAREST LLP**
900 Jackson Street, Suite 500
Dallas, Texas 75202
T: 469.904.4550

F: 469.444.5002
E: wburns@burnscharest.com
   lvincent@burnscharest.com

**<u>AND</u>**

Randy J. Ungar (LA #12387)
3701 Division Street # 255
Metairie, Louisiana
T: 504.957.6202
E:  randy@ungarlaw.net